# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 9, 2020        Decided June 18, 2021

No. 19-7160

ALEXANDER KHOCHINSKY,
APPELLANT

v.

REPUBLIC OF POLAND, A FOREIGN STATE,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cv-01532)

*Nicholas M. O'Donnell* argued the cause and filed the briefs for appellant.

*Desiree F. Moore* argued the cause for appellee. With her on the brief was *George C. Summerfield*. *Jonathan M. Cohen* entered an appearance.

Before: SRINIVASAN, *Chief Judge*, RAO, *Circuit Judge*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the court filed by *Chief Judge* SRINIVASAN.

SRINIVASAN, *Chief Judge*: In 2010, Alexander Khochinsky, then a Russian foreign national living in the

United States, contacted the Republic of Poland seeking restitution for the loss of his family's land during the Nazi invasion. In an effort to negotiate with Poland for the payment of restitution, Khochinsky offered a painting in his possession that he believed resembled one reported missing by Poland. Poland did not respond to the offer as Khochinsky anticipated. Instead, it sought Khochinsky's extradition from the United States on the ground that he was knowingly in possession of a stolen painting. Poland's extradition attempt ultimately failed.

Khochinsky then brought an action against Poland, alleging that the effort to extradite him was tortious and infringed his rights. The district court dismissed the suit, holding that the Foreign Sovereign Immunities Act gives Poland immunity from Khochinsky's action. We affirm.

I.

On appeal from a dismissal in favor of a foreign sovereign on grounds of sovereign immunity, we assume the unchallenged factual allegations in the complaint to be true. *Simon v. Republic of Hungary*, 812 F.3d 127, 135 (D.C. Cir. 2016).

A.

The story behind Khochinsky's suit traces back to a small town in Poland at the outset of World War II. At the time, Khochinsky's mother, Maria Khochinskaya, a Polish Jew, lived in the town of Przemysl, Poland, where her family owned property. In 1939, Nazi Germany invaded Poland, prompting the Soviet Union to respond by annexing a portion of Przemysl. The annexation cut the city in half, with Maria's residence falling within the annexed portion.

A few years later, on June 20, 1941, Maria and her grandmother took a trip that saved their lives. That day, a Friday, they traveled east to Lviv (then part of the Soviet Union) to observe the Sabbath with Maria's mother. The next day, Nazi Germany invaded the Soviet half of Przemysl, murdering Maria's relatives who had remained behind. Maria became heir to the family property in Przemysl, and that inheritance passed to Khochinsky upon his mother's death in 1989.

In the 1990s, Khochinsky returned to Przemysl to find that his mother's house had been replaced by a Catholic church. That was a surprise to Khochinsky because his family had never been compensated for the conversion of the property. He initially did not seek restitution from Poland, though, due to his perception that Poland was unreceptive to Holocaust-related restitution claims.

Khochinsky's calculus changed in 2010, when he learned that a painting reported missing from Poland resembled one that he had inherited from his father. When Khochinsky's father died in 1991, Khochinsky inherited *Girl with Dove*, a painting by French rococo master Antoine Pesne. According to Khochinsky's father, the painting had been in Germany before he acquired it following World War II. As for the painting reported missing by Poland, it had been looted from the Wielkopolskie Museum in Poland by Nazi forces and never recovered.

Khochinsky did not know whether the two paintings were one and the same. Regardless, Khochinsky believed that *Girl with Dove* might serve as a useful bargaining chip in his efforts to obtain restitution from Poland for his family's land. To that end, in 2010, he contacted Poland and offered *Girl with Dove*. A Polish official, indicating an interest in negotiating with

Khochinsky, sent an expert to Khochinsky's gallery to examine the painting. The expert determined that *Girl with Dove* was the missing painting but did not share his conclusion with Khochinsky.

Rather than negotiating with Khochinsky, Poland opted to pursue criminal charges against him. In January 2013, a Polish court accused Khochinsky of knowingly and unlawfully purchasing *Girl with Dove*, and Poland issued a "Wanted Person Notice" for his arrest. Later that year, Poland submitted a request to the United States for Khochinsky's extradition. In early 2015, an Assistant United States Attorney filed a petition for a certificate of extraditability in the United States District Court for the Southern District of New York. The next day, Khochinsky was arrested and imprisoned for more than one week. Upon release, Khochinsky was subject to continued house arrest and electric monitoring.

In August 2015, the district court denied the Government's petition for a certificate of extraditability and dismissed the extradition complaint. *In re Extradition of Khochinsky*, 116 F. Supp. 3d 412, 422 (S.D.N.Y. 2015). The court found that "the Government failed to adduce any evidence" that Khochinsky knew *Girl with Dove* was "stolen at the time he acquired it." *Id.* The court thus held that "the Government ha[d] failed to establish probable cause to believe that Khochinsky committed the crime with which he [was] charged." *Id.*

B.

In June 2018, Khochinsky filed suit against Poland in the United States District Court for the District of Columbia. Khochinsky claimed that Poland's unsuccessful—and, in his view, retaliatory—extradition request had caused him "substantial damage." Compl. ¶ 115, J.A. 17. Khochinsky's

complaint set out five counts against Poland: (i) a violation of his First Amendment rights by instigating a retaliatory extradition process; (ii) quiet title as to his ownership of *Girl with Dove*; (iii) tortious interference with his business stemming from his imprisonment and house arrest; (iv) aiding and abetting a trespass of his family land; and (v) abuse of process in connection with Poland's conduct in the extradition proceeding.

Poland did not timely answer Khochinsky's complaint or enter any appearance. As a result, on March 12, 2019, the Clerk of the Court entered a default against Poland. A few weeks later, however, on April 23, 2019, Poland moved to vacate the Clerk's entry of default and to dismiss Khochinsky's claims for lack of jurisdiction based on sovereign immunity. Two days after that, on April 25, Khochinsky moved for entry of default judgment.

The district court took up all three motions at once, granting Poland's two motions and denying Khochinsky's. First, the court found good cause for vacatur of the default, placing particular emphasis on the meritorious nature of Poland's jurisdictional defense. *Khochinsky v. Republic of Poland*, No. 18-cv-1532, 2019 WL 5789740, at *4 (D.D.C. Nov. 6, 2019). Second, and relatedly, the court determined that, under the Foreign Sovereign Immunities Act (FSIA) it lacked jurisdiction over Khochinsky's claims. *Id.* at *4–7. Third, in light of its jurisdictional ruling, the court denied Khochinsky's motion for default judgment as moot. *Id.* at *3 n.1.

6

II.

On appeal, Khochinsky challenges the district court's dismissal under the FSIA as well as the court's vacatur of the default. We reject those challenges.

A.

We first consider the district court's vacatur of the default, which we review for abuse of discretion. *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 965 (D.C. Cir. 2016). Under Federal Rule of Civil Procedure 55(a), "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). Here, Poland initially failed to respond to Khochinsky's complaint, and the Clerk of Court entered default against Poland. A few weeks later, however, Poland moved to vacate the Clerk's entry of default pursuant to Rule 55(c), which permits a court to "set aside an entry of default for good cause." Fed. R. Civ. P. 55(c).

In exercising its discretion under Rule 55(c), a "district court is supposed to consider 'whether (1) the default was willful, (2) a set-aside would prejudice plaintiff, and (3) the alleged defense was meritorious.'" *Mohamad v. Rajoub*, 634 F.3d 604, 606 (D.C. Cir. 2011), *aff'd sub nom. Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012) (quoting *Keegel v. Key West & Caribbean Trading Co.*, 627 F.2d 372, 373 (D.C. Cir. 1980). There is an interest favoring "the resolution of genuine disputes on their merits," such that "all doubts are resolved in favor of the party seeking relief." *Jackson v. Beech*, 636 F.2d 831, 835–36 (D.C. Cir. 1980). And that interest is pronounced in the context of a foreign state desiring to assert defenses based on its sovereign status. *See FG Hemisphere Associates, LLC*

*v. Democratic Republic of Congo*, 447 F.3d 835, 838 (D.C. Cir. 2006).

Here, the district court addressed the three primary considerations, finding that Poland's default was the result of confusion rather than willfulness, that Poland's defense of sovereign immunity was meritorious, and that Khochinsky suffered no prejudice from vacatur of the default. Khochinsky primarily attacks the district court's finding as to a lack of willfulness. But "[e]ven when a default is willful, a district court does not necessarily abuse its discretion by vacating a default when the asserted defense is meritorious and the district court took steps to mitigate any prejudice to the non-defaulting party." *Gilmore*, 843 F.3d at 966. That is the case here.

Khochinsky has no colorable argument as to meritoriousness or prejudice. "[A]llegations are meritorious if they contain even a hint of a suggestion which, proven at trial, would constitute a complete defense." *Mohamad*, 634 F.3d at 606 (quoting *Keegel*, 627 F.2d at 374). Poland's defense readily meets that standard, and in fact is ultimately meritorious, as discussed below. As for prejudice, there is no indication of any cognizable prejudice to Khochinsky from the vacatur of a default that had been entered a few weeks beforehand. When given an opportunity to address the point at oral argument, Khochinsky's counsel acknowledged the absence of prejudice. *See* Oral Argument at 23:30-24:00.

We thus find no basis to set aside the vacatur of the default, especially given that the defaulting party is a foreign nation seeking to assert the defense of sovereign immunity. As we have previously noted, "[i]ntolerant adherence to default judgments against foreign states could adversely affect this nation's relations with nations and undermine the State Department's continuing efforts to encourage foreign

sovereigns to resolve disputes within the United States' legal framework." *FG Hemisphere Associates*, 447 F.3d at 838–39 (quoting *Practical Concepts Inc. v. Republic of Bolivia*, 811 F2d 1543, 1551 n.19 (D.C. Cir. 1987)).

In an effort to bolster his argument that the district court erred in vacating the entry of default, Khochinsky seeks to supplement the record on appeal with evidence of a French court's October 2019 denial of Poland's further efforts to extradite Khochinsky, this time from Paris. That evidence, in Khochinsky's view, bears on whether Poland acted willfully in failing to respond to his complaint in this case. As explained, however, we sustain the district court's vacatur of default regardless of any willfulness on Poland's part. And at any rate, the evidence was not before the district court at the time of its grant of vacatur and thus does not bear on whether the court abused its discretion. *See Ctr. for Auto Safety v. EPA*, 731 F.2d 16, 24 n.9 (D.C. Cir. 1984).

Khochinsky raises one additional ground for setting aside the district court's vacatur of default: the court's decision not to enforce (or even acknowledge) Poland's failure to comply with local rules pertaining to the process for seeking vacatur of a default and to conferring with an opposing party before filing a nondispositive motion. Noncompliance with those procedural rules, however, did not prejudice Khochinsky in any material way. We thus find no abuse of discretion in the district court's vacatur of the default.

## B.

We now turn to the core of the case: Poland's assertion of sovereign immunity from Khochinsky's claims. We review de novo the district court's dismissal of the claims on grounds of

sovereign immunity. *El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 874 (D.C. Cir. 2014).

The FSIA, 28 U.S.C. §§ 1602 *et seq.*, affords the exclusive basis for a United States court to obtain jurisdiction over claims against a foreign state. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989). The statute first establishes a baseline grant of immunity, 28 U.S.C. § 1604, and then sets out various defined exceptions to that general grant, *id.* §§ 1605–07. The result is that courts lack jurisdiction over a claim against a foreign state unless it "comes within an express exception." *Price v. Socialist People's Libyan Arab Jamahiriya*, 389 F.3d 192, 196 (D.C. Cir. 2004).

Khochinsky contends that his claims implicate three FSIA exceptions: the implied waiver exception, 28 U.S.C. § 1605(a)(1); the counterclaim exception, *id.* § 1607; and the noncommercial tort exception, *id.* § 1605(a)(5). We agree with the district court that none of those exceptions extends to Khochinsky's claims.

1.

We first consider the implied waiver exception. Under 28 U.S.C. § 1605(a)(1), a foreign state will not be "immune from [ ] jurisdiction" in any case "in which the foreign state has waived its immunity either explicitly or by implication." Khochinsky contends that, by requesting his extradition, Poland implicitly waived its sovereign immunity as to all of his claims in this case. We disagree.

The FSIA does not specifically define what will constitute a waiver "by implication," but our circuit has "followed the virtually unanimous precedent construing the implied waiver provision narrowly." *Creighton Ltd. v. Gov't of Qatar*, 181

F.3d 118, 122 (D.C. Cir. 1999) (internal quotation marks and citation omitted).  In particular, we "have held that implicit in § 1605(a)(1) is the requirement that the foreign state have *intended* to waive its sovereign immunity."  *Id.* (emphasis added); *see Ivanenko v. Yanukovich*, 995 F.3d 232, 239 (D.C. Cir. 2021).  And as we have observed, "courts rarely find that a nation has waived its sovereign immunity . . . without strong evidence that this is what the foreign state intended." *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 444 (D.C. Cir. 1990) (quoting *Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 377 (7th Cir.1985)).

We have found the requisite evidence of a foreign state's intent to qualify as an implied waiver of sovereign immunity "in only three circumstances":  (i) the state's "executing a contract containing a choice-of-law clause designating the laws of the United States as applicable"; (ii) the state's "filing  a responsive pleading without asserting sovereign immunity"; or (iii) the state's "agreeing to submit a dispute to arbitration in the United States."  *Ivanenko*, 995 F.3d at 239; *see World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1161 n.11 (D.C. Cir. 2002).  And "courts have been reluctant to stray beyond these examples when considering claims that a nation has implicitly waived its defense of sovereign immunity." *World Wide Minerals*, 296 F.3d at 1161 n.11 (internal quotation marks omitted).

A foreign state's extradition request does not fit in that selective company.  Extradition operates upon norms of "international comity."  *See Casey v. Dep't of State*, 980 F.2d 1472, 1477 (D.C. Cir. 1992).  Extradition treaties implementing those norms have produced "a global network of bilateral executive cooperation that aims to prevent border crossing from becoming a form of criminal absolution." *Blaxland v. Commonwealth Dir. of Pub. Prosecutions*, 323

F.3d 1198, 1208 (9th Cir. 2003). Conditioning a foreign state's exercise of treaty rights on submitting to the jurisdiction of United States courts could imperil the spirit of cooperation and comity underpinning that regime. In that context, there is good reason to doubt that a foreign state's effort to exercise its agreed-upon treaty rights exhibits an intent to relinquish its immunity from suit. And were we to find that a foreign state's extradition request implies a waiver of immunity in United States courts, we might expect that, as a reciprocal matter, the United States would subject itself to suit in foreign proceedings whenever it requests extradition assistance. *See id.* at 1208 n.6. We know of no sound basis for putting the parties to an extradition treaty to that choice as a matter of course.

That is particularly so in view of extradition's fundamentally diplomatic, executive character. "Subject to judicial determination of the applicability of the existing treaty obligation of the United States to the facts of a given case, extradition is ordinarily a matter within the exclusive purview of the Executive." *Shapiro v. Sec'y of State*, 499 F.2d 527, 531 (D.C. Cir. 1974), *aff'd sub nom. Comm'r v. Shapiro*, 424 U.S. 614 (1976). The Executive generally "conducts the procedure on behalf of the foreign sovereign," such that the foreign state "makes no direct request of our courts" and "its contacts with the Judiciary are mediated by the executive branch." *Blaxland*, 323 F.3d at 1207. Because a foreign sovereign operates at a level of remove from United States courts when it seeks our assistance in extradition, there is all the more reason to doubt that an extradition request connotes an intent to waive the requesting sovereign's immunity in our courts.

For essentially these reasons, the only other court of appeals to address the issue held that an extradition request does not impliedly waive sovereign immunity. *Id.* at 1206–09. In reaching that conclusion, the Ninth Circuit in *Blaxland*

distinguished the sole case on which Khochinsky relies here, a previous Ninth Circuit decision, *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699 (9th Cir. 1992). That earlier decision involved a letter rogatory, which is a "direct court-to-court request," whereas "extradition is a diplomatic process carried out through the powers of the executive, not the judicial, branch." *Blaxland*, 323 F.3d at 1207. While we have no occasion here to decide the status of a letter rogatory for purposes of the FSIA's implied waiver exception, we agree with the Ninth Circuit that an extradition request does not effect an implied waiver of sovereign immunity.

The terms of the specific extradition treaty at issue—between the United States and Poland—suggests no ground for drawing any different conclusion in the specific circumstances. The U.S.-Poland Treaty does not directly address the subject of sovereign immunity against actions in either party's courts. Rather, the Treaty generally provides for the signatory countries to "request extradition . . . through the diplomatic channel." Extradition Treaty Between the United States of America and the Republic of Poland, U.S.-Pol., art. 9, July 10, 1996, T.I.A.S. No. 99-917. And by making use of the Treaty's "diplomatic channel" through a request for assistance from the United States's Executive Branch, Poland did not subject itself to the jurisdiction of United States courts.

2.

Khochinsky next argues that two of his claims—the claim for quiet-title related to *Girl with Dove* and the claim for aiding-and-abetting-trespass related to his family land in Przemysl—fall within the FSIA's counterclaim exception. Under that exception, "[i]n any action brought by a foreign state, or in which a foreign state intervenes," the "foreign state shall not be accorded immunity with respect to any counterclaim" fitting

within three defined categories. 28 U.S.C. § 1607. Those three categories include, as relevant here, a counterclaim "arising out of the transaction or occurrence that is the subject matter of the claim of the foreign state." *Id.* § 1607(b). According to Khochinsky, the extradition proceeding amounts to an "action brought by a foreign state" within the meaning of that provision, and his quiet-title and aiding-and-abetting-trespass claims arise out of the same "transaction or occurrence" as the extradition proceeding.

Even assuming that those two claims arise out of the same transaction or occurrence as the original extradition proceeding, Khochinsky's claims simply do not constitute "counterclaims" for purposes of the FSIA's counterclaim exception. Consistent with the ordinary understanding of a counterclaim, *see* Fed. R. Civ. P. 13, the counterclaim exception applies only when there is an "action brought by a foreign state, or in which a foreign state intervenes," and when the ostensible "counterclaim" is brought "in" that same action. *See* 28 U.S.C. § 1607 ("*In* any action brought by a foreign state . . .") (emphasis added).

Khochinsky's claims against Poland satisfy neither requirement. First, as the district court observed, the extradition proceeding was brought by the *United States*, not Poland, and at no point did Poland "intervene in the extradition proceeding or appear as a party in the proceeding at all." *Khochinsky*, 2019 WL 5789740, at *6. Second, Khochinsky brings his current claims in an entirely distinct action, one that he, not the foreign state, initiated. Those claims, then, are not counterclaims, much less counterclaims in an action brought by a foreign state. Khochinsky responds that he was unable to assert his claims in the original "action," i.e., the extradition proceeding. But that only confirms that an extradition

proceeding is not the sort of action as to which the FSIA's counterclaim exception generally applies.

3.

Third and finally, Khochinsky argues that two of his claims—the claims for First Amendment retaliation and for tortious interference with business relations—fall within the FSIA's noncommercial tort exception. That exception potentially applies in any case:

> in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment.

28 U.S.C. § 1605(a)(5). But even if Khochinsky's relevant claims fit within that description, the exception excludes from its coverage "any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." *Id.* § 1605(a)(5)(B).

Poland contends that Khochinsky's pertinent claims are ones "arising out of . . . abuse of process," *id.*, and we agree. Khochinsky's First Amendment retaliation claim asserts that Poland undertook the extradition process to retaliate against his speech. Compl. ¶¶ 120, 122, J.A. 18. And his tortious interference claim contends that Poland's actions caused him to be imprisoned and subjected to house arrest. Compl. ¶ 133, J.A. 19. Both of those claims "arise out of" an alleged "abuse of process"—i.e., an alleged abuse of the extradition process. While Khochinsky observes that the two claims are not

themselves actions for abuse of process, the statutory language covers not just claims *of* abuse of process, but any claims "*arising out of*" an alleged "abuse of process." 28 U.S.C. § 1605(a)(5)(B) (emphasis added). That is true of Khochinsky's two relevant claims here, both of which "derive from the same corpus of allegations concerning his extradition." *Blaxland*, 323 F.3d at 1203; *see Cabiri v. Gov't of the Republic of Ghana*, 165 F.3d 193, 200 (2d Cir. 1999).

Khochinsky submits that the term "abuse of process" for purposes of § 1605(a)(5)(B) refers solely to abuse of judicial process, whereas extradition is a diplomatic process. But as the Ninth Circuit observed in *Blaxland*, a claim against a foreign state for wrongfully "invoking the extradition procedures" involves an "abuse of process" within the meaning of § 1605(a)(5)(B). *Blaxland*, 323 F.3d at 1204. Whether the term "abuse of process" is "defined according to a uniform federal standard or according to applicable state law"—here, District of Columbia or New York law—the term "concern[s] the wrongful use of legal process," including an alleged effort to "misuse[] legal procedures to detain" or "extradite" someone. *Id.* at 1204, 1206; *see* Restatement (Second) of Torts § 682 (1977) (defining tort of abuse of process); *Doe v. District of Columbia*, 796 F.3d 96, 108 (D.C. Cir. 2015) (same under D.C. law); *Curiano v. Suozzi*, 469 N.E.2d 1324, 1326 (N.Y. 1984) (same under N.Y. law). And Khochinsky is wrong, moreover, insofar as he assumes that extradition is an exclusively diplomatic process, to the complete exclusion of any judicial role: while extradition, as we have explained, is fundamentally diplomatic in character, it ultimately involves the courts in some measure in its execution—as evidenced by the termination of the extradition proceedings in this case upon a judicial determination that probable cause was lacking.

For all of those reasons, an alleged abuse of the extradition process counts as an "abuse of process" under § 1605(a)(5)(B). It follows that Khochinsky's claims of First Amendment retaliation and tortious interference fall outside the scope of the FSIA's noncommercial torts exception.

\*     \*     \*     \*     \*

For the foregoing reasons, we affirm the district court's grant of Poland's motion to dismiss for lack of jurisdiction.

*So ordered.*